2022 IL App (2d) 210769-U
No. 2-21-0769
Order filed May 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Z.L., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 21-JA-206 |
| | ) | |
| (People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Beverly W., | ) | Jorge L. Ortiz, |
| Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court's adjudication of neglect for the minor child, Z.L., was against the manifest weight of the evidence where the record did not show a nexus between respondent's mental health and an injurious environment. Therefore, we reverse.

¶ 2   At issue in this appeal is whether the trial court erred in adjudicating the minor child, Z.L., neglected based on an environment injurious to his welfare. Respondent, Beverly W., argues that the trial court erred for several reasons, including its determination that she was mentally ill. For the reasons herein, we reverse.

¶ 3                                  I. BACKGROUND

¶ 4    The Department of Children and Family Services (DCFS) took Z.L. into temporary custody on September 10, 2021. On September 13, 2021, the State filed a petition for adjudication of wardship and temporary custody hearing. The petition alleged that Z.L. was a neglected minor in that his environment was injurious to his welfare because respondent, his mother, had a history of mental illness and she falsely obtained an order of protection against Joshua W., Z.L.'s biological father.

¶ 5    A shelter care hearing began on September 14, 2021, via Zoom. Joshua was present but unrepresented by counsel, and the trial court appointed an attorney for him. Because his appointed attorney was not present, the trial court continued the hearing to September 21, 2021.

¶ 6    At the continued hearing, Stephanie Lawson testified as follows. She was the DCFS officer assigned to Z.L.'s case. She was in contact with respondent on September 8, 2021, and she wrote several reports based on her interaction with respondent. She learned that Z.L. was staying with Joshua after being given to him by Z.L.'s maternal great-grandmother, Beverly Washington. At the time she did not have verification that Joshua was his father. After further investigation that included a DNA test, she discovered that Joshua was the father and determined that he would be an appropriate placement for Z.L. However, on September 10, 2021, at 2:45 p.m., she took Z.L. into protective custody, based on respondent obtaining an order of protection against Joshua.

¶ 7    Joshua offered a stipulation that there was probable cause that Z.L. was neglected based on respondent's history of mental illness. As a basis for his assessment of her mental health issues, his counsel noted a number of text messages from her to Joshua and stated that her mental health had been a longstanding issue. Respondent personally responded that she did not have a relationship with Joshua and that he did not know her history. She also claimed that Joshua hurt

Z.L., alleging that the child had bruising. The State replied that respondent had raised concerns of abuse in the past but that the last Du Page County sheriff's report indicated Z.L. had no bruising.

¶ 8      The trial court found probable cause that respondent had a history of mental illness, that an immediate and urgent necessity existed to remove Z.L. from the home and place him in shelter care, and that reasonable efforts could not be made to prevent or eliminate the need to remove him from the home. The court placed Z.L. in the temporary custody of DCFS, ordered DCFS to file a service plan, and required visitation to be supervised. In a separate order, the trial court stated that Joshua was Z.L.'s biological father per DNA paternity test results.

¶ 9      On October 21, 2021, Z.L.'s guardian *ad litem*, Kathy Gordon, filed a motion to return him to his father's custody and close the case. On November 4, 2021, the trial court entered an order providing that Joshua was to have custody and guardianship of Z.L. and observe a set of conditions for his care.

¶ 10                          A. Adjudicatory Hearing

¶ 11    An adjudicatory hearing began on December 8, 2021. The State introduced several exhibits, including People's Exhibit No. 1, which contained the certified DCFS indicated report and accompanying investigative documents. After the State offered People's Exhibit No. 1, the trial court asked if there was any objection. Respondent's counsel stated: "No objection to those coming in. They are the indicated reports." No other party objected, and the indicated report and investigative files were admitted into evidence without objection.

¶ 12    The report provided the following, in relevant part. On August 30, 2021, DCFS received a call concerning the safety and wellbeing of Z.L. The reporter, who also had a DCFS case open against her, believed that respondent was homeless and had been living out of her car for two months. However, a safety assessment from the same day showed that respondent and Z.L. were

actually living with Washington, and no bruises or injuries were observed on Z.L. The safety decision noted that there was a "lot of drama" with the family, and it was difficult to tell who was telling the truth. The report continued that respondent had previously left Z.L. in the care of someone who had ongoing substance abuse issues and used cocaine around Z.L., but she would not come pick Z.L. up due to a warrant out for her arrest. The report stated that respondent used marijuana around Z.L. and that she used psychedelics, although it was unknown whether she used those around Z.L. Respondent had a partner, Billy, and their relationship included acts of domestic violence. Further, the report said that respondent fed Z.L. junk food and that following a dental appointment, it was discovered that Z.L had extensive cavities and that there was nothing to do for his teeth until he got older. On September 11, 2021, the reporter called again and stated that respondent had obtained an order of protection against Joshua under false pretenses.

¶ 13    The reporter was respondent's sister, Brittany. Washington spoke in person with Lawson on August 30, 2021, and she said that Brittany currently had a feud with respondent. Washington believed that Brittany was making up everything because she was jealous that respondent still had her son but that she did not have her kids. In a text message to Lawson on September 20, 2021, Brittany stated that she was "just mad" when she made the report, that respondent and Z.L. had never lived in a car, and that she could say what was true and what was not true about her report in court. Lawson responded that she could not be present in court but that she could let the state's attorneys know about her text. Another text message from Brittany that day stated that she did not say that respondent did drugs.

¶ 14    A supervisory note was created by Julie Cummings on September 9, 2021. She contacted Lawson, who stated as follows. Respondent was homeless and told her that she was moving into an apartment in October, but she would not provide an address. Respondent had mental health

issues. Respondent's boyfriend was living with her, and there was concern that he was pimping her out and that he also had mental health issues.

¶ 15    Lawson created several contact notes from September 9, 2021. In one note, she recounted contact with respondent in which respondent shared the allegations from her September 9, 2021, petition for an order of protection against Joshua. She also included the text messages that drove her to file the petition. Lawson wrote that she had read through numerous messages from respondent and stated that it was respondent, not Joshua, who was writing them and that she could provide examples as to why she believed this.

¶ 16    In her contact notes, Lawson included several Du Page County Sheriff's incident reports. In one sheriff's report from August 19, 2020, the deputies contacted an emergency room doctor at Good Samaritan Hospital, who noted that respondent had reported a charge of forced sex trafficking by her boyfriend, who would "brand" her when she did not listen. Respondent had sought medical attention for dizziness, confusion, and nausea; she was slurring speech and having trouble standing. The doctor advised the deputies that respondent had been diagnosed with a condition related to schizophrenia and that he believed she needed further psychological evaluation. The examining nurse told the deputies that she observed scars on various places throughout respondent's body that were consistent with being burned.

¶ 17    Another contact note recounted a call between Lawson and Washington on September 9, 2021. During the call, Washington stated as follows. Respondent had mental health issues and constantly lied about everything and everyone. Joshua was not a threat to Z.L. despite what respondent may say, and she took Z.L. to him in order to ensure he would be safe. Respondent was lying about having a job and living in Chicago; she was actually living out of her car. When respondent had been living with her, she did not contribute to Z.L.'s care.

¶ 18    As part of a substance abuse summary, Lawson screened respondent on September 10, 2021, and the summary provided that she was exhibiting "unusual or extreme behavior (overly alert, agitated paranoid)." In the additional comments on the summary, Lawson wrote that respondent stated she had an eating disorder but denied other mental health issues. Her drug test was invalid, and concerns remained about her using drugs and having mental health related issues.

¶ 19    A supervisory note from September 10, 2021, stated that Du Page County officers had gone to Joshua's residence and observed Z.L. He had no bruises or marks, and they had no concern for Z.L. in Joshua's care.

¶ 20    A contact note from September 12, 2021, memorialized a September 10 phone call between Lawson and Cook County Officer Lebek. Lebek stated that respondent had been in prison for about a year and half due to continuing violations of orders of protection. Respondent had previously called in a bomb threat and committed identity theft. Lebek was unaware of any drug use by respondent, but she believed she suffered with mental health issues.

¶ 21    A risk assessment from September 13, 2021, stated that there were problems with Z.L.'s functioning in his current living situation because respondent was homeless and living in her car. It also assessed a risk that respondent was unable to provide needed assistance or care to the child due to her "ongoing mental health issues." Also on September 13, Lawson spoke with Officer King from the Waukegan police department. King stated that respondent was staying in the Waukegan area and came to the police department about "some bizarre things." She was "trying to insinuate the child was in trouble," and she showed King some messages. King believed the messages were probably fake and generated on an app. A contact note between Lawson and the Vernon Hills police department included a domestic incident report from September 7, 2021, in

which the officers reported that respondent and Billy were living out of her car and had stayed at the Metra the night before. Billy wanted out of the relationship because it was abusive.

¶ 22    In a supervisory note from September 13, 2021, Cummings reiterated that respondent had extensive mental health issues and had been in prison for a year and a half for violating orders of protection. Respondent also had past suicide attempts and had been psychiatrically hospitalized.

¶ 23    As evidence that respondent was responsible for an environment injurious to Z.L.'s welfare, the indicated report provided that respondent continued to make false reports regarding Z.L.'s foster home to the police and DCFS. The police had been to the residence several times, reaching a point where they were threatening to file harassment charges against respondent. The report also stated that respondent had gone to Z.L.'s foster home and threatened the foster parent, who was one of Joshua's parents, preventing the foster parent and child from entering the residence and resulting in another call to the police. It additionally cited a statement from Washington that Z.L. was not in a good situation.

¶ 24    The report recommended that respondent be indicated on allegations of (1) a substantial risk of physical injury and an environment injurious to the minor's health and welfare and (2) inadequate supervision, but that the allegation of (3) inadequate food be unfounded.

¶ 25    The State's first witness was Joshua, who testified as follows. He was 31 years old and living in Du Page County. He met respondent sometime in 2018, and they hung out for about a month, which was right around when Z.L. was conceived. At the time, respondent told him that she was sure that Z.L.'s father was her ex-boyfriend.

¶ 26    Around August 2020, respondent told him that she had a DNA test with her ex-boyfriend and that her ex-boyfriend was not the father. She said that if he would get a DNA test, it would show that he was the father. He agreed to get a DNA test in January 2021 and paid respondent for

it. However, respondent took the money and "disappeared for a couple months." He was in touch with respondent again in May, and this time he paid for the DNA test directly. The test result determined that he was Z.L.'s father.

¶ 27 Prior to the DNA test, he had seen Z.L. about once a month, but after the DNA test, respondent distanced herself from him. Following his paternity determination, respondent allowed him very little visitation with Z.L.

¶ 28 On September 8, 2021, Washington brought Z.L. to Joshua's home. He discovered that day that DCFS had begun an investigation into Z.L.'s care. DCFS allowed Z.L. to remain in his custody. Z.L. was removed from his custody because respondent obtained an order of protection against him in Lake County. At the time of the petition, he resided in Du Page County. The order of protection indicated that paternity was not established. Respondent's petition for an order of protection alleged that Joshua was sending threats to her via text message, and he denied sending the messages. The messages allegedly sent did not appear on his phone.

¶ 29 Respondent had called 911 on him "well over 100" times over the past several months, maybe "150 plus." The police came to his house in response to those calls for a number of reasons, mostly for well being checks. He was never arrested or taken into custody based on respondent's 911 calls.

¶ 30 Respondent did not show up to court to defend the order of protection against him, and therefore it was dismissed. While the order of protection had been pending in Lake County, respondent sought another order of protection against him in Cook County. That order was also dismissed. In addition, respondent petitioned for an order of protection against Joshua's parents, who were Z.L.'s foster parents, and that order was dismissed.

¶ 31    Washington testified next as follows. She was 74, and respondent was her granddaughter. She had been respondent's guardian from the time she was four years old. She had taken care of Z.L. since he was three months old because respondent had been in prison and had given her guardianship. When respondent got out of prison in April 2020, Washington did not want respondent to have Z.L. back because she did not have a safe place for him. Respondent was under house arrest, and respondent's probation officer said that respondent could not stay with her, and so she sought guardianship of Z.L. through the court. This upset respondent. Respondent would call DCFS and the police to say that she had taken her child.

¶ 32    Washington obtained an order of protection against respondent in April 2020 because she wanted her to stay away until she got her life together and had a place to stay. After that she was going to give Z.L. back to her because she knew that she loved him.

¶ 33    She initially testified that she brought Z.L. to Joshua on September 8, 2021, because although respondent was asking to take Z.L., she was unsure whether respondent could have custody of Z.L. until she passed a drug test. Her concern was based on information she had received from Lawson; she had never personally seen respondent use drugs. She did not have any concerns about Z.L.'s safety in Joshua's care. Respondent had told her that Joshua had a temper, that he needed parenting classes, and that Z.L. had come back from his care with bruises. She did not believe respondent. Joshua seemed to love his son very much and had a nice family. She could not take respondent's word on the matter.

¶ 34    The State asked Washington about an interview she gave with Lawson. Washington confirmed that she told Lawson that Joshua would never do anything to hurt Z.L. She also told Lawson that she was tired of respondent calling the police. At the time of the interview, she was very upset with respondent. She admitted that she may have told Lawson that respondent was not

stable, but she currently believed that respondent was a good mom. She agreed that respondent "probably" threatened her and told her she hoped she would die and that she would step on her grave. However, she said they were over it and forgave each other.

¶ 35 In addition, she told Lawson that Billy could not stay at her home. She "never liked him," and had "bad vibes" about him. Also, she was a Jehovah's Witness, and she would not allow them to live with her unmarried and "do what you do when you live together." Respondent chose to stay with Billy and that is why she was living in her car. Washington agreed that is why she did not want Z.L. to stay with respondent, but at the time she did not know that respondent actually had an apartment in Chicago, stating "[a]ll the time she had a place to live." When asked where respondent was living on September 9, 2021, she said she was living with her.

¶ 36 Washington did not immediately remember telling Lawson that respondent had mental health issues. Later in her examination, she admitted that she told Lawson that respondent had depression, anxiety, and sometimes could be bipolar, but she denied that she had mental illness, insisting that "[n]one of my grandchildren have mental illness." She testified that respondent had been diagnosed with depression, anxiety, and bipolar disorder while growing up.

¶ 37 Lawson testified as follows. As a DCFS officer, she investigated Z.L.'s case and spoke with Joshua. She explained that Z.L. was taken into protective custody after Washington had dropped Z.L. off with Joshua because respondent obtained an order of protection against him.

¶ 38 On respondent's motion for a directed finding, the trial court reviewed the State's exhibits, which included reports on respondent's living conditions, and ruled as follows. The records indicated that Z.L.'s dental condition was bad, with a report that his dentist had said that he had never seen a mouth so bad in a child that young. The records also contained allegations as to respondent's mental health and drug abuse. On the basis of these records as well as the credible

testimony of Washington, the trial court found that the State had presented a *prima facie* case that Z.L.'s environment was injurious to his welfare. It denied the motion.

¶ 39    Respondent testified as follows. She called the police on Joshua three times. She called because he did not answer his phone while he had possession of Z.L. She denied that a dentist ever told her that Z.L. had issues with his teeth. She denied ever being in prison, stating that she was in Cook County jail. She also denied being homeless and living out of her car. From August 12 through September 9, 2021, she and Z.L. had been living with Washington. She denied doing drugs in front of Z.L., and she denied ever being diagnosed with a mental illness as an adult. While in her care, Z.L. had regular doctor visits, received his vaccinations, and was never diagnosed with any illnesses.

¶ 40    Respondent petitioned for an order of protection against Joshua because after Washington took Z.L. to him, they got in an argument over the phone and he blocked her number. He then started texting her from another number. She was concerned for Z.L. because the last three times he had come back from Joshua's house he had bruises on his legs and face.

¶ 41    Respondent had been psychiatrically hospitalized approximately three times when she was a child. She was currently 24 years old, and she denied being psychiatrically hospitalized for depression and suicidal ideation in April 2020.

¶ 42                    B. Trial Court Findings and Dispositional Hearing

¶ 43    The trial court found respondent's testimony to be "evasive and not credible." It found that she clearly made some false reports in order to obtain an order of protection against Joshua, which named Z.L. as a protected party. It noted that she made allegations of physical abuse against Joshua but never followed up on any of them, and it found that the evidence established that she had suffered and did suffer from psychiatric disorders. It found Joshua's testimony that respondent

called the police many times credible, and it characterized the many 911 calls and petitions for order of protection as "bizarre behavior." It again cited the documentary evidence of Z.L.'s dental condition and respondent's use of drugs in his presence. It concluded that the State had proved by a preponderance of the evidence that Z.L.'s environment was injurious to his welfare in that respondent had a history of mental illness and falsely obtained an order of protection. It therefore adjudicated Z.L. neglected. Z.L. was to remain in the custody of Joshua until at least the dispositional hearing. It entered a written order that same day memorializing its findings.

¶ 44    The dispositional hearing took place on December 21, 2021. Following the hearing, the trial court stated as follows. Having considered the submitted reports and the argument and recommendations of counsel, it did not find it in Z.L.'s best interest to make him a ward of the court. It found instead that Joshua was fit and that he was the proper person to have custody, care, and control of Z.L. It found respondent unfit for reasons other than financial circumstances alone. It was in Z.L.'s best interest to be returned to the custody of Joshua. It suspended respondent's visitation until such time that she would demonstrate engagement with recommended services. Respondent's recommended services included anger management, parenting classes, individual therapy, and domestic violence treatment.

¶ 45    Respondent timely appealed.

¶ 46                                    II. ANALYSIS

¶ 47    Respondent raises several issues on appeal, which converge on the central issue of whether the State proved that Z.L. was a neglected minor. She also argues that we should apply plain-error analysis to review the admission of the DCFS indicated report and investigative files. She does not challenge the trial court's dispositional ruling. We first consider the State's argument that respondent invited the admission of the DCFS indicated report and investigative file.

¶ 48                                     A. Invited Error

¶ 49     Respondent invokes the plain error doctrine to raise issues that her counsel failed to object to in the trial court. In particular, respondent raises error in her counsel's failure to object to the foundation of People's Exhibit 1, the DCFS indicated report and investigative file. The State argues that respondent's failure to object constituted invited error.

¶ 50     We agree with the State that respondent invited error in the admission of People's Exhibit 1. The doctrine of invited error provides that a party may not request the court to proceed in one manner and then argue on appeal that the requested action was error. *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24. The invited error doctrine has been found to apply to bar a defendant from claiming error in the improper admission of evidence where the admission was procured or invited by the defendant. *People v. Harvey*, 211 Ill. 2d 368, 386 (2004). "When a party procures, invites, *or acquiesces* in the admission of evidence, even though the evidence is improper, that party cannot contest the admission on appeal." (Emphasis added.) *People v. Caffey*, 205 Ill. 2d 52, 114 (2001) (finding that defendant acquiesced to admission of evidence where defense counsel replied "no objection" after a sidebar to the State's request to play a tape and distribute transcripts to the jury); *cf. People v. Hollahan*, 2019 IL App (3d) 150556, ¶¶ 17-18 (in contrast to a request for or express agreement to a procedure, the mere failure to object to the procedure did not amount to invited error), *rev'd on other grounds*, 2020 IL 125091. When a party invites an error, the plain-error exception does not apply; the invited error goes beyond mere forfeiture and instead estops plain-error analysis. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 51     Here, the State sought to admit the DCFS indicated report and investigative file at the adjudicatory hearing. The trial court asked if there was any objection, and respondent's counsel answered that he had no objection and confirmed that the documents were the indicated report.

Unlike a mere failure to object (see *People v. Palomera*, 2022 IL App (2d) 200631, ¶ 57), respondent's counsel acquiesced to the admission of the evidence, and respondent's plain-error argument is therefore precluded by invited error.

¶ 52                              B. Neglect Finding

¶ 53    We turn now to respondent's contentions that the trial court erred in finding Z.L. neglected, in light of both the testimony at the adjudicatory hearing and the admission of the indicated report and investigative files. Respondent makes several arguments related to the trial court's adjudication of neglect. First, she contends that her due process rights were violated in that the trial court did not require the State to prove her mental illness through either oral testimony of a qualified witness or certified medical records of her condition. She argues that the State's exhibits contained multilevel hearsay statements related to her mental health, and that under section 2-18(4) of the Juvenile Court Act (Act) (705 ILCS 405/2-18(4) (West 2020)), the admission of such documents is only proper as relating to the minor, and her mental health was not a condition relating to Z.L. She argues that either live testimony or a certified record of her mental health should have been required and that the State did not present any expert testimony but relied on only lay witnesses at the adjudicatory hearing.

¶ 54    She continues that the trial court improperly assumed the role of a mental health professional. She criticizes the trial court's conclusion that she was acting "bizarre," arguing that only a mental health professional would be able to objectively evaluate her circumstances, which included her history of abuse. She cites evidence from the Du Page County sheriff's report that officers noted evidence of branding on her and that she was the victim of sex trafficking. She argues that this explains why she was overprotective of Z.L. and fearful of other men being

abusive, including Joshua. She concludes that the State failed to present evidence sufficient to support that she had a mental illness.

¶ 55    Next, respondent argues that the trial court relied on unsupported or insufficient evidence, including giving too much weight to the DCFS indicated report and investigative files. For instance, as to Z.L.'s dental condition, the only evidence was from the initial report to DCFS, and she argues that information received via a DCFS hotline call is not sufficient to prove the truth of the allegations. See *In re Wheeler*, 86 Ill. App. 3d 564, 569 (1980). Likewise, she contends that the allegation of drug use was reflected only in the initial report.

¶ 56    In addition, respondent argues that obtaining an order of protection against Joshua was not evidence of neglect. She argues that the record does not support that she fabricated text messages to support her petition. She contends that, contrary to evidence of neglect, seeking the petition showed her concern for Z.L.'s safety. She concludes that the decision to seek the order of protection was evidence that she wanted to protect her child.

¶ 57    Last, respondent argues that the State failed to prove a nexus between her mental health and an injurious environment. She contends that no witness testified that she was having a psychological episode, and evidence of past behavior was not supported as continuing to the present. She further argues that the State did not connect any mental illness to her seeking an order of protection.

¶ 58    The State responds that respondent's due process rights were not violated. It notes that both Washington and respondent herself were available at the hearing, and therefore the trial court did not have to rely on hearsay alone but considered the DCFS report and investigative files along with witness testimony. The State also argues that the trial court did not improperly place itself in the role of a mental health professional, asserting that the ultimate neglect finding was an issue for

the trial court to decide and that laypersons can testify to mental health. In addition, the State emphasizes that the trial court did not have to diagnose respondent but instead had a history of mental illness to review. The State argues that it ultimately proved that respondent had a mental illness, citing both the DCFS investigative report and witness testimony such as Washington's, where she stated that respondent had depression, anxiety, and could be bipolar.

¶ 59    As to respondent obtaining an order of protection against Joshua, the State argues that the record supports that she made false allegations against Joshua in her petition and that the trial court found Joshua's testimony credible and respondent's testimony incredible. It argues that as a direct result of her petition, Z.L. was removed from his father's care and placed into protective custody, which was not in his best interest.

¶ 60    Last, the State argues that there was a nexus between respondent's mental health and "bizarre" behavior and the trial court's finding of neglect. It directs us to Washington's statement to Lawson that respondent was not stable and also her action of taking Z.L. to Joshua because she "needed to get [Z.L.] out of here." It reiterates that the trial court found Washington and Joshua credible but not respondent, and that respondent's false petition for an order of protection created an injurious environment by causing Z.L. to be removed from Joshua's care and placed in protective custody. The State also cites a Du Page County sheriff's report from August 2020, in which she appeared in a disoriented state and the emergency department doctor stated that respondent had been diagnosed with Tardive Dyskinesia, which was related to schizophrenia. It argues that this incident shows that she had a more recent, serious mental health episode than the reports of mental health hospitalizations as a child.

¶ 61    We agree with respondent that the State failed to sufficiently establish a nexus between her mental health problems and the alleged neglect. In proceedings under the Act, the paramount

consideration is the best interests of the child, and cases involving allegations of neglect require a decision based on their unique circumstances. *In re Z.L.*, 2021 IL 126931, ¶ 58. The Act sets forth a two-step process to determine whether a minor should be removed from their parents' custody and made a ward of the court: (1) an adjudicatory hearing on the petition for adjudication of wardship, and if the minor is found to be abused or neglected, (2) a dispositional hearing. *Id.* ¶¶ 59-60 (citing sections 2-18(1) and 2-21(2) of the Act (705 ILCS 405/2-18(1), 2-21(2) (West 2018)). At the adjudicatory hearing, the court considers only the question of whether the minor is neglected. *Id.* ¶ 59. The State has the burden of proving the allegations of neglect by a preponderance of the evidence. *Id.* ¶ 61. In adjudicating a child neglected, a court must make written factual findings supporting the neglect determination. 705 ILCS 405/2-21(1) (West 2020); see *In re Abel C.*, 2013 IL App (2d) 130263, ¶¶ 20-22 (requiring an express factual basis to enable appellate review of the trial court's finding of neglect).

¶ 62    We will not reverse a trial court's neglect findings unless they are against the manifest weight of the evidence. *In re A.L.*, 2012 IL App (2d) 110992, ¶ 13. A ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v Best*, 223 Ill. 2d 342, 350 (2006). In addition, the trial court is in the best position to observe the demeanor and conduct of the parties and witnesses and thus determine the credibility of witness testimony. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 31. We will not substitute our judgment for that of the trial court on credibility determinations. *In re E.L.*, 353 Ill. App. 3d 894, 897 (2004).

¶ 63    Under the Act, a neglected minor includes "any minor under 18 years of age *** whose environment is injurious to his or her welfare." 705 ILCS 2-3(1)(b) (West 2020). Courts have described an "injurious environment" as an amorphous concept that cannot be defined with

particularity, but it has been interpreted generally to include the breach of a parent's duty to ensure a safe and nurturing shelter for their children. *In re A.P.*, 2012 IL 113875, ¶ 22.

¶ 64    The mere fact that a parent has a mental illness is alone an insufficient basis to prove neglect; the State must show a nexus between the mental illness and a risk of harm to the child. *In re Faith B.*, 349 Ill. App. 3d 930, 933 (2004). Here, the record supports that respondent engaged in harassing behavior (*e.g.*, calling the police repeatedly on Joshua and showing up at the foster parent's house and threatening the foster parent) and that she had a history of mental illness (*e.g.*, Washington's testimony that respondent had depression, anxiety, and could be bipolar). However, the State did not connect respondent's mental illness to her care of Z.L. or even directly to her harassing behavior. As respondent argues, there was no allegation of a psychiatric episode, much less a psychiatric episode linked to a particular mental illness, and therefore the State failed to show that her harassing behavior was the product of any particular mental illness.

¶ 65    Moreover, many parents have a mental illness, like depression, and provide a safe and nurturing environment for their children. While we acknowledge the trial court's concern for respondent's mental health—the investigative files are full of lay opinions that she struggles with mental illness, and respondent certainly demonstrated unstable behavior—the State had the burden to show that her mental illness created an environment injurious to Z.L.'s welfare. The record as it stands raises valid concerns about respondent's mental health but does not connect the dots from her mental health to her inadequate and unsafe care for Z.L. We note that the record also raises serious concerns about respondent's living situation, in that the record reasonably supported that she was living in her car with Billy and that her relationship with Billy involved acts of domestic violence. However, the trial court made no findings as to respondent's homelessness nor her relationship with Billy.

¶ 66    In addition, the allegations of Z.L.'s dental issues arose solely from the initial DCFS report, which was insufficient proof of neglect. See *In re G.V.*, 2018 IL App (3d) 180272, ¶ 29 (information from a DCFS hotline call may be admitted to show why an investigation began, but it is not itself sufficient to prove the truth of the allegations). Likewise, the allegations of drug use stemmed from the DCFS report but were never corroborated. Although Lawson had concerns about drug use, respondent never tested positive for drugs. Lebek also reported that she was unaware of respondent's drug use in Cook County, and Brittany had recanted her allegation of respondent's drug use.

¶ 67    Last, we address respondent's filing for an order of protection. We reject respondent's argument that her filing for an order of protection actually showed her care for Z.L. Based on the investigative files and the trial court's credibility assessments of Joshua and respondent, it was not against the manifest weight of the evidence for the trial court to find that she falsified the allegations against Joshua. Nevertheless, like the trial court's determination on respondent's mental health, there is no direct connection between respondent's false filing for the order of protection and respondent failing to provide a safe and nurturing environment for Z.L. We acknowledge that the result of the filing was Z.L. being taken into protective custody, but there is nothing in the record to support that protective custody was itself an injurious environment for Z.L.

¶ 68    In sum, the trial court's factual basis for its finding of neglect was Z.L.'s poor dental health, respondent's alleged drug use, her history of mental health issues, and her false filing for an order of protection. See *supra* ¶ 43. The trial court's finding of neglect was therefore against the manifest weight of the evidence because all these bases lacked either factual support apart from the initial DCFS report or a nexus to an injurious environment. Accordingly, we reverse.

¶ 69                              III. CONCLUSION

¶ 70    For the reasons stated, we reverse the judgment of the circuit court of Lake County.

¶ 71    Reversed.