NOTICE
Decision filed 12/22/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220478-U

NO. 5-22-0478

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 22-JA-34 |
| | ) | |
| Jasmyn G., | ) | Honorable |
| | ) | Matthew D. Lee, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court's adjudicatory order, finding that J.B. was a neglected minor, was not contrary to the manifest weight of the evidence, we affirm the court's dispositional order making J.B. a ward of the court and awarding custody and guardianship to the Department of Children and Family Services.

¶ 2    The respondent, Jasmyn G., is the natural mother of J.B., born September 30, 2020.

The respondent appeals the trial court of Champaign County's order of July 19, 2022,

dispositional order and its finding that J.B. was neglected due to an injurious environment.

The respondent properly raises one issue on appeal, and that is whether the trial court erred

1

in finding that the minor child was neglected due to an injurious environment. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4     On March 30, 2022, the State filed a juvenile petition[1] pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), regarding the respondent's biological child, J.B., born September 30, 2020. Count I of the juvenile petition alleged that J.B. was neglected as defined in section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), because he was a minor under 18 years of age whose environment was injurious to his welfare. The petition alleged that because J.B. resided with the respondent, that environment exposed J.B. to the effects of the respondent's mental illness.

¶ 5     On March 30, 2022, the trial court conducted a shelter care hearing regarding J.B. The respondent was not present at the shelter care hearing despite having been provided with notice of the hearing on March 29, 2022. At the hearing, the trial court found that there was probable cause for the filing of the petition and that it was an immediate and urgent necessity for J.B. to be placed in shelter care. Further, the trial court found reasonable efforts had been made to prevent or eliminate the necessity for removal of J.B. from the home, as the Department of Children and Family Services (DCFS) had offered intact services, but the respondent refused those services. Accordingly, the trial court granted shelter care and appointed DCFS as temporary guardian of J.B. The trial court

---

[1]The juvenile petition filed on behalf of J.B. was also filed against J.B.'s natural father; however, the natural father's rights are not at issue in this appeal.

2

appointed a special advocate (CASA) as guardian *ad litem* on behalf of the minor child and set the matter for an adjudicatory hearing.

¶ 6 The adjudicatory hearing was held on June 21, 2022. At the hearing, Rikki McComas, a police officer for the Village of Rantoul, Illinois, testified that on March 27, 2022, at approximately 6 p.m., she was dispatched to the Walmart in Rantoul for a welfare check. Upon arriving at Walmart, McComas spoke with the store's loss prevention employee and then the respondent. According to McComas, she first contacted the respondent in front of the pharmacy, where the respondent became angry at the sight of McComas. The respondent then began throwing items out of the stroller that were in her possession and told McComas that "she hadn't stole anything." McComas stated that J.B. was in the stroller at that time and that "his upper half was covered with a coat." According to McComas, when the respondent first began speaking with her, J.B. was lying still in the stroller and the respondent was aggressively throwing the stroller around and J.B. was not moving. McComas stated that she asked to check on J.B., as his upper body was covered with a heavy adult coat and his lower half was not moving. The respondent would not initially allow McComas to check on the child. According to McComas, after approximately 15 to 20 minutes, she was able to check on J.B. while the respondent was in one of the check-out aisles. At that point, J.B. was sleeping, woke up, and was fine.

¶ 7 According to McComas, when she first spoke with the respondent, she told McComas that the respondent's "other children were sleeping behind her," but no other children were present. McComas testified that she never identified any other children besides J.B. being present in the Walmart with the respondent. McComas testified that

3

when the respondent was in the self-checkout aisle, she was still acting erratically and then went to the restroom after making her purchase. When asked what she meant by saying the respondent was acting erratically, McComas explained: "She had an item she was trying to purchase. She can [*sic*] scanned it three different—the same item she scanned at three different self-checkout registers before finally paying for it. She was yelling."

¶ 8    McComas stated that she did not initially follow the respondent into the restroom but entered it a few minutes later. According to McComas: "She was—had things sprawled out around the stroller in the common area of the restroom. She was not in a stall. [J.B.] was half naked. She had his onesie and she was drying it under the hand dryer." McComas clarified that J.B.'s lower half was naked, and that the respondent did put a diaper and a "onesie" on the child. After that, the respondent dressed J.B. in a light jacket and placed diapers on each of his feet. McComas continued explaining the respondent's erratic behavior, stating: "She was throwing items around. Her pants were halfway down her buttocks, exposing herself. At one point, she pulled her pants down and placed something in her genitals, I don't know what it was, and told me she was on her period." McComas stated that this all occurred in the common area of the restroom with other people going in and out.

¶ 9    McComas testified that she attempted to speak with the respondent regarding her mental health by asking her if she would agree to be evaluated by emergency medical technicians or go to the hospital because McComas believed that the respondent needed to speak with somebody. The respondent did not cooperate and would not answer McComas's questions so that McComas could assess the respondent's mental status. McComas then

4

testified that the temperature on the day of the incident was "in the 30's" and agreed that it was a cold, March day. It was McComas's opinion that J.B. was not appropriately clothed for the weather, and the respondent stated that she was going to walk home. McComas testified that the respondent did not state where she lived but that McComas knew, or found out, where the respondent lived.

¶ 10    McComas testified that she offered the respondent a ride home, but she did not accept the ride. Rather, the respondent walked down the middle of the road where the Walmart was located and then walked into traffic on Murray Road, which "is a busy road." McComas stated that the respondent, while pushing J.B. in the stroller, actually walked in front of a car and that McComas had to activate her squad car's overhead lights to prevent the respondent from being hit by other vehicles. After the incident, McComas spoke with the respondent's roommate and then contacted DCFS. McComas further testified that since the March 27, 2022, incident, she had one or two additional contacts with the respondent, in addition to several contacts she was aware of that the Rantoul Police Department had with the respondent. McComas finished by testifying that her subsequent contacts with the respondent were related to the respondent's mental health.

¶ 11    On questioning by the guardian *ad litem*, McComas gave more detail in describing how the respondent was aggressively moving the stroller around by stating:

"Almost flipping it over, like aggressively moving it around, maneuvering around like objects in Walmart, like the shelves, just like flipping it over. I didn't know if the child was secure. She was angry and trying to get away

5

from us initially, so quickly moving around corners—and almost flipped it over."

Upon further questioning, McComas reiterated that J.B. was in the stroller during this time and was also in the stroller during the time when the respondent was throwing items from the top canopy portion and from under the stroller onto the floor.

¶ 12    Lucas Gault, an investigator with DCFS, testified that the reason for the DCFS investigation was a hotline report regarding the Rantoul Police Department being called to the Walmart concerning the respondent's erratic behavior with J.B. According to Gault, he spoke with the respondent on March 28, 2022, at her sister's residence where she also lived, and where J.B. was present. The respondent was not cooperative during the interview and did not answer questions. According to Gault, if the respondent did answer a question:

"If she did, it was either restating the question in the form of a sentence, or she would speak incoherently to the point where I couldn't understand her, or she would go on with statements that were either out of the—out of this world, like she would say something about blood being all over the place or people being in body bags."

According to Gault, the answers the respondent gave did not pertain to or match the questions given.

¶ 13    Gault testified that J.B. was there with the respondent when she answered the door and that she told J.B. not to answer any questions. Gault testified that J.B. was not even a year old and classified his observations of the respondent's interaction with J.B. as atypical. Gault stated that these interactions caused him concern, explaining that J.B. would come

6

up to the respondent seeking attention. Gault testified that if the respondent picked him up, it was like watching somebody pick up a rag doll. "She'd pick him up by the forearms, not very gently. If she did not pick him up, she would tell him he was being needy and that he was always whining." According to Gault, the respondent told J.B. to leave her alone several times.

¶ 14    Gault then testified that he spoke with the respondent about the March 27, 2022, Walmart incident but that the respondent was unable to provide him with any information regarding the incident. Gault also asked the respondent about her mental status and she informed Gault that she was diagnosed with schizophrenia, bipolar, and ADHD.[2] According to Gault, the respondent informed him that she was diagnosed with those disorders when she gave birth to her other two children and that she self-medicated with cannabis. Gault then testified that, although the respondent did not state she used any other types of illegal substances, she made other comments that led Gault to believe the respondent used other substances. Finally, Gault testified that DCFS took protective custody of J.B. on March 28, 2022, because of his concerns about J.B. remaining in the respondent's care due to her mental health disorders.

¶ 15    The respondent did not testify on her own behalf or call any witness to rebut the testimony of McComas or Gault. At the close of all the evidence, the trial court made its findings and ruling on the record in open court, acknowledging that mental illness alone is not sufficient to meet the burden of proof required for a finding of neglect. The trial court

---

[2]ADHD is a common acronym for a mental health condition known as attention deficit hyperactivity disorder.

continued by stating that the evidence presented in the matter "goes beyond simply the existence of the illness itself." The trial court noted that the testimony demonstrated that the respondent herself disclosed her schizophrenia, bipolar, and ADHD diagnosis. Further, there was evidence presented of the respondent's behaviors that corroborated those diagnoses, all of which the trial court found to be probative to the issue of whether or not the respondent's mental illness exposed J.B. to an injurious environment.

¶ 16    In support of the trial court's findings, it then enumerated the respondent's behaviors observed by McComas, including: (1) J.B.'s head being covered by a coat and the respondent acting erratically; (2) the respondent's nonsensical behavior such as trying to scan an item multiple times, yelling, and being incoherent; (3) the respondent going into the restroom where Officer McComas observed the respondent scattering items across the floor; (4) the respondent putting diapers on J.B.'s feet and J.B. not being appropriately clothed in the cold weather; (5) upon leaving Walmart, the respondent walked into the middle of traffic while pushing J.B. in the stroller, in front of a vehicle which required Officer McComas to intervene by activating her emergency lights to prevent the respondent and J.B. from being hit by cars; and (6) the respondent almost flipped over the stroller by aggressively pulling it around while J.B. was seated in it.

¶ 17    The trial court then turned to the testimony of Gault, noting Gault's observations that the respondent was (1) speaking incoherently; (2) not answering questions in a way related to the initial question; (3) making nonsensical statements, such as "there's blood all over the place, people are in body bags"; and (4) telling J.B., an infant, not to answer questions. Further, the trial court referenced the interactions Gault observed between the

8

respondent and J.B. such as the respondent picking J.B. up by his forearms like a ragdoll, saying that J.B. was too needy, and telling J.B. to leave her alone.

¶ 18   According to the trial court, all of the respondent's behaviors provided ample evidence that the respondent's mental illness endangered J.B.'s welfare and safety. The trial court also noted the respondent's statement that she was currently medicating her mental illness with cannabis rather than with prescribed medication. The trial court found that the State had met its burden of proof "certainly by a preponderance of the evidence and, and, for that matter, clear and convincing evidence" that J.B. was neglected by being in an environment injurious to his welfare. The trial court then set the matter for dispositional hearing, ordered DCFS to prepare a dispositional report, and admonished the respondent to immediately contact and cooperate with DCFS and the terms of the service plan.

¶ 19   The trial court entered its written adjudicatory order on the same date, June 21, 2022, finding J.B. to be abused or neglected as defined by section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)), in that J.B. was in an environment that was injurious to his welfare as defined by section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). The written adjudicatory order specifically enumerated the bases for the trial court's finding.

¶ 20   On July 12, 2022, DCFS filed its dispositional report prepared by child welfare specialist Gabrielle Smith and an integrated assessment with the trial court that set forth, in detail, the facts and circumstances surrounding the events of March 27, 2022. The report also noted that the respondent failed to attend the scheduled, in-person interview on May 11, 2022, and, therefore, a telephone interview was attempted on May 16, 2022. According

9

to the report, the respondent "presented with periods of emotional lability" and the telephone interview was ended early due to the respondent's "presentation and difficulty with engagement." Further, during the interview the respondent provided "discrepant information regarding her history of DCFS involvement" which affected the respondent's reliability, credibility, and the quality of her report. The report also noted the respondent's residential arrangements and her relationship status, including her history of domestic violence. When questioned regarding her employment, the respondent was unwilling or unable to provide her work history, became frustrated, would speak incoherently, and gave responses that were not on topic.

¶ 21 According to the report, the respondent was recommended for several services including a psychiatric assessment, substance abuse, domestic violence, parenting education, and visitation. According to the caseworker, the respondent did inform the caseworker that she had a past diagnosis of schizophrenia and was hospitalized in 2019, after a suicide attempt. The report noted that the respondent was not medicated, nor had she established care with a psychiatrist. The report further noted that the respondent's roommate, Meghan Gould, reported that in June 2022, Gould took the respondent to the Pavilion Behavioral Health Center to receive treatment, but that the respondent had refused treatment. Gould also attempted to call law enforcement and an ambulance, but the respondent was found not to be a risk to herself or others and, again, the respondent had refused treatment. Similarly, the respondent was unwilling to engage in mental health treatment, was uncooperative, and would not complete an assessment. According to the

10

report, assessments and classes pertaining to the remaining services would be completed upon further meeting with the respondent.

¶ 22    On July 19, 2022, the trial court conducted a dispositional hearing. The respondent was present with counsel. The trial court asked counsel for the respondent if counsel had reviewed the dispositional report, to which counsel responded in the affirmative. The trial court also asked counsel for the respondent if counsel would stipulate that Gabrielle Smith would testify substantially as indicated in the report, to which counsel responded "yes, sir." The trial court then heard statements from all counsel regarding the recommendations contained in the report. Counsel for the respondent stated that "there are issues to be addressed," and that "we would accept the recommendations in the report at this time."

¶ 23    The trial court made its findings on the record stating that it considered the dispositional report, the recommendations of counsel, and the factors set forth in the Juvenile Court Act. The trial court continued, stating that based upon the information and evidence presented at the adjudicatory hearing, as well as the dispositional report, it was in the best interest of J.B. and the public to make J.B. a ward of the court, adjudicating J.B. neglected. The trial court then turned to the respondent, noting her previous mental illness diagnosis of schizophrenia, that she was currently not taking medication, and that she had not established care with a psychiatrist. The trial court further noted the respondent's mental health decline in recent weeks which included the incident at and outside of Walmart. Finally, the trial court noted the respondent's unwillingness to engage in mental health treatment, obtain inpatient care at Pavilion, or complete a mental health assessment.

11

¶ 24   The trial court entered the dispositional order on July 19, 2022, finding the respondent unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor child. The trial court adopted and incorporated its oral and written findings at all prior hearings, including the temporary custody and adjudicatory hearings. The trial court stated that: "The Court further finds that respondent mother struggles with longstanding mental health issues that prevent her from safely caring for the minor at this time and have been exacerbated by her continued refusal to engage in services designed to address her mental illness." The trial court further found that appropriate services aimed at preservation and family reunification have been unsuccessful in rectifying the conditions that led to the finding of unfitness. Based upon those findings, the trial court found it to be in the best interest of J.B. be made a ward of the court and to grant custody and guardianship to DCFS.

¶ 25   The respondent now appeals, arguing that the trial court's ruling that J.B. was neglected due to an injurious environment was against the manifest weight of the evidence.

¶ 26                                    II. ANALYSIS

¶ 27   The Act (705 ILCS 405/1-1 *et seq.* (West 2020)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). At the adjudicatory hearing, the trial court is required to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* The State is required to prove its allegations of abuse or neglect by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). The trial court is afforded broad discretion when making a determination of abuse or neglect. *In re*

*Stephen K.*, 373 Ill. App. 3d 7, 20 (2007). Therefore, the trial court's decision should not be disturbed unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record. *Id*. "Because the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight to be given to the witnesses' testimony." *Id*. If a finding of abuse, neglect, or dependence is made, the trial court must then determine whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2) (West 2020).

¶ 28    Section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." The general definition of "neglect" is "the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Stephen K.*, 373 Ill. App. 3d at 20. Cases adjudicating neglect are *sui generis* and must be resolved by evaluating the unique facts and circumstances present in each case. *Id*. Similarly, "injurious environment" does not have a fixed definition, but has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 29    The respondent does not challenge the allegation that she suffers from a mental illness but challenges the trial court's finding of neglect based on an injurious environment. The respondent argues that the court's finding was against the manifest weight of the

13

evidence, where the State did not prove a nexus between her mental illness and a risk of harm to the minor.

¶ 30    In this appeal, the respondent directs this court to consider the allegation contained in the petition for adjudication of wardship, which alleges that J.B. was in an environment injurious to his welfare when he resided with the respondent and that environment exposed J.B. to the effects of the respondent's mental illness. The respondent acknowledges her statement to Lucas Gault, that she was diagnosed with schizophrenia, bipolar disorder, and ADHD,[3] for which she self-medicated with cannabis, was a statement against interest and admissible as substantive evidence against her. While the mere fact that a parent has a mental illness does not lead inevitably to the conclusion that a child in his or her care is neglected or that their environment is injurious, a parent's mental illness may form the basis for a finding of an injurious environment, where there is a nexus between the mental illness and a risk of harm to the child. *In re Faith B.*, 349 Ill. App. 3d 930, 933, (2004).

¶ 31    The respondent argues that the trial court had no basis on which to conclude that the behavior described by the witnesses was the product of the respondent's mental illness and exposed the minor to an injurious environment. The respondent directs this court to *In re Z.L.*, 2022 IL App (2d) 210769-U. In *In re Z.L.*, the injurious environment allegation indicated that the respondent had a history of mental illness and that she falsely obtained an order of protection against the minor's biological father. *Id*. ¶¶ 4, 8. While the record

---

[3]Respondent's brief argues that "the record includes testimony by Mr. Gault of a statement against interest by Jasmyn G., in which she told him she had been diagnosed with schizophrenia, bipolar disorder, and PTSD"; however, Gault testified that the respondent reported she had been diagnosed with schizophrenia, bipolar, and ADHD. The respondent acknowledges the correct diagnoses from the record in the facts section of the brief. The inclusion of PTSD in the respondent's argument appears to be an oversight.

supported a finding that the respondent engaged in harassing behavior and that she had a history of mental illness, the appellate court found that the State did not connect respondent's mental illness to her care of the minor. *Id*. ¶ 64.

¶ 32    The present case is distinguishable. Unlike *In re Z.L.*, in the present case, the trial court found that the respondent was diagnosed with "schizophrenia, bipolar and ADHD" and self-medicated with cannabis. That finding was supported by the respondent's admission. Further, the testimony regarding the respondent's actions, when considered with her admission, supported an inference that the respondent was suffering from an untreated mental illness. Turning to the connection between the respondent's mental illness, behavior, and care for the minor, the trial court recited the facts of the incident on March 27 and 28, 2022, indicating that the respondent was behaving "inappropriately as related to the care of her child." Further, the trial court found that the respondent exhibited dangerous behaviors toward the minor including grabbing the child violently by the arms to pick him up, covering his head with a heavy jacket while he was seated in a stroller, almost flipping the stroller with the baby inside on multiple occasions, walking into oncoming traffic with the baby in the stroller, and exposing the minor to cold winter weather while underdressed. The trial court further found that the respondent responded to questions in a nonsensical manner and behaved inappropriately toward the one-year-old minor, telling him to leave her alone and warning him not to answer any questions. The trial court found that the behaviors were the product of the respondent's mental illness and exposed the minor to an injurious environment.

¶ 33    The respondent argues that the testimony of McComas and Gault provided nothing more than speculative conclusions regarding the respondent's behavior and any form of mental illness. The respondent contends, therefore, that there was no basis on which the trial court could conclude that the respondent's behaviors were the product of her mental illness that exposed J.B. to an injurious environment.

¶ 34    The State argues that the evidence presented at the adjudicatory hearing was sufficient to prove that J.B. was exposed to an injurious environment, where he was in the sole care of the respondent, who was experiencing a mental health crisis. Therefore, the State argues that the trial court's finding was not against the manifest weight of the evidence. The State further argues that the testimony presented at the hearing was sufficient to prove the nexus between the respondent's actions, her mental illness, and the injurious environment it exposed J.B. to, specifically referencing the McComas's detailed testimony regarding the March 27, 2022, incident, and Gault's testimony regarding his encounter with the respondent and J.B. on March 28, 2022. We agree.

¶ 35    Contrary to the respondent's assertions, the testimony of McComas at the adjudicatory hearing supports a finding that on March 27, 2022, the respondent was suffering from a mental health condition that created an injurious environment for the minor. Further, the testimony of Gault supports the finding that on March 28, 2022, the respondent was continuing to suffer from the mental health condition, which continued to place the minor in an injurious environment. The record is replete with evidence regarding the respondent's untreated mental illness and her actions, which clearly failed to provide a safe and nurturing shelter for the minor.  As such, the evidence clearly established that the

16

respondent failed to exercise the care that the circumstances justly demanded. Considering the wide discretion afforded the trial court in decisions regarding neglect and its ability to observe the demeanor and credibility of the witnesses, we conclude that the trial court's finding that the minor was neglected due to an injurious environment was not against the manifest weight of the evidence.

¶ 36                                III. CONCLUSION

¶ 37    For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.


¶ 38    Affirmed.